Good morning. I'm Billy Wilkins and with the court's permission on behalf of Brad Johnson and Carol Dinn, I would like to address the denial of our Rule 50B motion, Reliance on Advice of Counsel, and the Fifth Amendment issue. Beatty Asheville will address Latonya Mallory's Reliance on Advice of Counsel, and Nicky Shutt will address the pre-judgment allotment issues. The appellants were denied a fair trial. Here are just three of the reasons why. One, if the judge had followed the laws as set out in his charge to the jury, he would have been compelled to grant our motion for judgment as a matter of law. The trial judge charged that to prove an anti-kickback statute violation, the government was required to prove that the appellants knowingly and willfully paid an improper remuneration to induce referrals. The judge then correctly defined improper remuneration as, and I quote, payment for services already paid by another or payment for more than fair market value. There was no evidence of double billing, and there was no evidence that the process in handling the fee exceeded fair market value. In addition, the appellants could not have acted willfully. They could not have intended to violate the anti-kickback statute, and they could not have knowingly violated the False Claim Act because it was not until July 2014, some six years later, that the government announced for the first time a new legal interpretation of how it would view the payment of P&H fees. As the D.C. Circuit held in the Farrell case, strict enforcement of the knowledge requirement helps ensure that innocent mistakes made in the absence, as in this case, of finding interpretive guidance are not converted into liability. So your position, Mr. Wilkins, is that your clients didn't know anything about this until 2014. They had not received any kind of indication or warning that what they were doing was not off track a bit? Well, I'm not sure the word warning is the same thing as being cautious. And of course, the lawyers are very cautious, as all good lawyers are. Well, I don't want to interrupt you, but let's go to the General Counsel. And I looked at it, and I thought about it. What if you were the counsel in a case like this? That looked like to me was a pretty direct letter. That thing was more than a shot across the bow. That was a shot at the ship directly right there. I'm sorry. The letter from the counsel, from the General Counsel that indicated to them that there was a problem here. They indicated there may be a problem. He said, what we got to understand is there may be a risk that the government would argue that this is a violation. But the bottom line was, every indication was, that this was not a violation of the law until the government came down July 2014 and said, and it even contradicted itself in that order, in that opinion that I'll get to in just a minute. But the second error that was made by the judge, or another error, is he refused to charge the reliance of advice of counsel, which is not only a versatile error, but something goes to what this court should be considering and will consider, I'm sure, when it assesses the lack of the scienta requirement in this case. The third error, a third error, the judge unconsciously, I mean, improperly allowed the government to ask a non-witness, Kyle Martell, a non-party witness, 62 questions, knowing that he was going to take the fifth, 62 different times. And the judge knew this was wrong because he instructed the lawyers prior to trial, I'm going to limit you, and I quote, to your five or six juiciest questions. Well, the judge did not do that. He allowed 62 questions, and then he turned to the jury twice and said, an adverse inference may be drawn from Martell taking the fifth. Now, historically, according to the Medicare manual, it's the lab's responsibility to process and handle blood draws, and the cost is paid to the lab by Medicare. And there are several ways to do this, and one way is for a lab to contract with a physician's practice, have the physician's practice agree to do the work, and then reimburse the physician's practice at fair market value. And this is the way many, a great majority of HGL's competitors handle this job. Nevertheless, before this method was selected, the legal opinion from the healthcare and business attorneys advising them that this was legal but was obtained and used to draw up the contract, and the appellants repeatedly sought legal advice for the entire six years that they were being paid. And, counsel, one of your arguments is, I think you just told us, that the district court didn't allow you to rely on that advice. Is that correct? It didn't charge the jury that we could rely on advice. Okay, well, the district judge did say that when he gave a good faith instruction, this includes all the legal opinions and advice received by or known to the defendant, regardless of the source, to determine whether the defendant acted in good faith. What more do you want? I want to charge the same that the D.C. Circuit held in the Freeze case. And that's the same thing that happened in that case. The judge gave that totality of evidence charge, including you can rely on advice or counsel. The D.C. Circuit says that's not sufficient. Although the charge, and I quote from this case, the defense argued, and the government argued, well, they didn't disclose everything to the lawyers. Here's what the court said. Even though that may be the position of the government, the jury was not exposed to one critical piece of the puzzle. Good faith reliance on advice or counsel is a valid defense, and it proved it is required to be charged. And that's exactly what we have right here. And let me tell you why the judge did not charge advice or counsel. He said, it just doesn't fit. It just doesn't fit. What you did was wrong. You broke the law. Therefore, I'm not going to charge reliance on advice or counsel. That's just not right. Mr. Wilkins, this is a huge record. You didn't try the case, did you? No, I did not. Did you try the case? How long was the trial? 12 days. Yes, but somebody tells me it's 14 days. Well, maybe, maybe. And like I said, I was not involved in the trial. Mr. Ashmore was. He could probably speak to that. Okay. Okay. So what is your strongest argument? What do you characterize as your strongest argument here? My strongest argument, well, I got three strongest arguments. The first one, the strongest one, there's no reason in the world for these folks to believe that if they paid a P&H fee at fair market value, that there would be a violation of the anti-kickback statute. Now, until the 2014, July 11, 2014 Special Fraud Alert came out. Here's what I'm reading from this document issued by the government, OIG, and I quote just a few lines to make my point. It says, OIG has issued a number of guidance documents and advisory opinions, including the 1994 Special Fraud Alert. In these and other documents, we have repeatedly emphasized that paying a physician more than fair market value for his or her services could constitute illegal immigration under the anti-kickback statute. When a laboratory pays a physician more than fair market value for a physician's services, the anti-kickback statute is implicated. Here's the new interpretation. Depending on the intent of the parties, the anti-kickback statute is implicated regardless of whether the payment is at fair market value. Now, that's the change right there. And until that time, the dependents had every right to rely upon the fact that fair market value was allowed. Indeed, when this came out, they stopped right then. And it's only crime that they committed was not being able to foresee that somewhere in the future, the government was going to change its interpretation and its view and its position on how it was going to view the payment of P&H fees at fair market value. I see my time is about up. Thank you. Can I ask you one more question before you sit down? This is on my time. So there are three theories of liability here, right? Yes. Is it your position that the government had to prevail on all three? No, just one. Just one that it didn't prevail on any of them. No, I understand that part. Okay. Thank you very much. jury charge that Tanya Mallory was entitled to receive, did not get, and Judge Gergel was required to give her that charge, and he didn't based on a mistake of facts and the law. At the jury charge conference, Judge Gergel held at Joint Appendix 41-17 that the evidence shows that between January of 2010 when HDL began paying process and handling fees until April of 2012 when the Ruggio opinion was produced, there was no opinion. So you can't have reliability. There's no reliance from 2010 until 2012. That is simply not the case, and we introduced a number of documents and live testimony to prove otherwise to include defendants exhibit 31 found at 5109 in the Joint Appendix. That was an email chain that a competitor posing as a consumer posed this question. You've been contacting physicians and telling them that for every specimen you send your lab, you will pay him $20. How is this not a kickback and a violation of federal law? This is in 2010. So as we demonstrated throughout the course of the trial, that email makes its way up the chain without amendments, deletions, redactions, and it gets its way to Tanya Mallory, and Ms. Mallory does what she always did, and she got the lawyers involved, and she sends this inquiry to her lawyers who at the time in 2010, that was Dennis Ryan. He was the head of LeClaire Ryan, a 250-member firm. She used only the best lawyers that she could find. She poses this to Mr. Ryan in 2010 along with Patrick Hurd, who is the LeClaire Ryan health care expert, and Mr. Ryan sends the email back to Tanya Mallory. We are on solid ground with the OIG advisory opinion. So she gets the advice from her lawyers that she's on solid ground in 2010. Again— Let me ask the question on this because I think one thing we want to do is make sure that we cover this fully and understand why Judge Gergel ruled as he did. On the advice of counsel, of course, I think you agree with the evidence, at least the law, that it does require that there is a full disclosure to this counsel. In other words, you can't rely on advice in which you have not told everything, and Judge Gergel essentially says, no, there's not evidence that you told them about this P&H pitch of fees as a lucrative business opportunity, and he says that your clients also receive warnings from the lawyers there. And I know Mr. Wilkins characterized those as, well, it's not a big deal warning, but maybe I'm reading something different on that memo that was sent out. But that thing looked like to me it did more than raise a red flag. It was pretty pointed. But that's essentially where Judge Gergel went on it, is that there wasn't a full disclosure to the evidence. It just didn't show that you went in and gave all of the facts and therefore got this advice to say, okay, to go with it. Because it requires good faith reliance on it. I agree with that, Your Honor, of course. And that's at Joint Appendix 4179, where Judge Gergel says there is no evidence of full disclosure, and I could not more strongly disagree with that. To the contrary, Tanya Mallory, the evidence was uncontroverted. She shared everything with her lawyers, to include Ropes and Gray at the end of this case, and she was paying them $1 million a month. That's the level of interaction she had with her lawyers. And there's no evidence in the record whatsoever, no evidence, to indicate that she did withhold something from her lawyers. But before you leave, and I get your point on that, even if that's true, why is this instruction, Judge Gergel's instruction, not sufficient here? I mean, he does tell them that they can rely upon the good faith and that you could rely upon legal opinions and advice received by, regardless of the source of it. I mean, that's part of the instruction that he does give. So why is that not substantially covering this instruction that you sought to get? It does not go far enough. Good faith is certainly a strong defense, but the jury charge that we requested would absolve Tanya Mallory of any liability. Had we gotten that jury charge, the jury would have returned a defense verdict. Bear in mind, we won 90% of this trial, is what I like to say. The government asked for $186 million in the opening, and the jury gave them $16 million. And so it simply does not go far enough. We needed that charge to be presented to the jury. And had that been done, Tanya Mallory would have received a defense verdict. Mr. Ashmore, your time has expired unless my colleagues have any questions. I have one other question. None of the defendants claim a safe harbor, do they? I don't believe so, Your Honor. Does anybody else on the court have a question? No. Okay, thank you. This is always a problem when you divide argument. May it please the court, Your Honor. My name is Nettie Schott, along with my colleagues, we represent non-parties and interests. Specifically, one of the defendants in the case Judge Wilkins just talked about is Cal Dent. We represent the family of Cal Dent. I hope Judge Floyd recognizes me from three years ago. Three years ago, we were up before this court representing Mrs. Dent and two companies of hers, before Judge Gregory, Judge Floyd, and Judge Duncan, asking this court to dissolve pre-judgment remedies. What the court held then was that it was interlocutory, so we are back again now that there has been a final judgment, and asking this court again to dissolve those as overreach and clear error. So, it's fair to say that Mr. Dent's family was under siege, Your Honors. Within six months of this case being unsealed under the Federal Debt Collections Procedures Act, the government asked for pre-judgment remedies and did not just ask them against Mr. Dent, against a party, but also asked them against his wife and companies, and ultimately against his parents, her parents, 10-year-old son, two other children. And so, as to Mrs. Dent, there is clear error in her companies, Lakeland Pines LLC and Trinity Island LLC, clear error by the court and overreaching by the government in having those writs of attachments attached to her property without following subchapter D of the Federal Debt Collections Procedures Act. Under subsection D, the government must bring an action in proceeding that was not brought, and therefore, clear error. And I'm sorry, my time has already expired. I will answer any questions that the panel has. I don't think we have any. Thank you very much. Thank you. Thank you. May it please the court, Benjamin Schultz on behalf of the United States. Following a lengthy jury trial, the jury returned a verdict finding that defendants Dent, Johnson, and Mallory were liable for numerous violations of the False Claims Act. The evidence showed that that could be sustained, among other reasons, because the defendants engaged in an illegal scheme to pay commissions to independent contractors. So your other side says it's not illegal because it's below the fair market value. So to be clear, Your Honor, that argument is about the P&H fees, and I'd be happy to walk the court through the numerous, numerous pieces of evidence from which the jury concluded that these were substantially above fair market value. But that was the beginning. You don't need a lot. You just need to be able to show some evidence that we're able to support it. So you don't need to spend a lot of time. If you think it's there, then tell us what it is. Absolutely. Let me walk the court through all of this evidence. And you can find a lot of this on page 39 of the government's brief. So first, can I ask you, just before you begin, can you tell me, is there sufficient evidence in this record so that we could affirm on just one of your theories? Yes. Any of these theories would be sufficient. So if it's the commission theory, that would be entirely sufficient to sustain the verdict, the P&H theory, or the medical necessity. Any one of these theories would be sufficient to sustain the verdict. And secondly, what do you believe is your strongest theory? You know, I think the commission theory and the P&H theory have different things. The commission theory is a little bit cleaner because I think the defendants spend a lot of time trying to claim that they had counsel's advice with regard to P&H fees. There's all sorts of problems with that, and I'd be happy to walk the court through that. But with the commission theory, they never introduce any evidence that any lawyer specifically told them that this was not a violation of the anti-kickback statute. There is significant evidence that lawyers warned them the other way, that the commission scheme was a big problem. And, of course, that's the clear language of the anti-kickback statute, which says that you can't pay remuneration to someone for, among other reasons, to induce them to either recommend that someone have a federally funded health service or to arrange that someone have a federally funded health service. And that's exactly what these independent contractor salespeople did. And I'd be happy to walk through the evidence that they were specifically warned by that, or I could go answer Judge Wynn's question about free market value. Certainly. No, no. I want you to stay right where you are. Judge, Ms. Monson is asking you to look at these claims. You don't have to do all of them. What is your rigor? Which is the one that you have to hang your hat on? Because, you know, I mean, you do have multiple ways to do it, but if there is one that is very clear, we can focus in on that more so. Or you may want to say, well, they all are just equal, as Mr. Wilkins indicated. Sure. Well, I think the court might be able to write a little bit of a shorter opinion if it goes on the commission theory, so I'd be happy to walk the court through that one if you'd like. And just starting with the evidence about how they were warned away against the commissions, I'll start at joint appendix pages 2569 to 70. This is the testimony of Nicholas Pace. He was an attorney who worked for HDL. He was a senior executive. He oversees their compliance efforts. And then I'll just read the testimony. Question, did you see an issue with paying commissions to the third party, Blue Wave? Answer, I did. Again, if you go back to the anti-kickback statute, there's a prohibition against that. There's safe harbors for that, and this was not structured to comply with that. Question, and did you talk about that concern in board meetings? Answer, we did. And it's also set forth in Derek's memo referring to the general counsel's memo. And if you go to that memo that Your Honor was referencing with regard to that memo, that memo, in addition to identifying the problem with the P&H fees, also identified problems with the commissions. Then there's additional stuff. There's the evidence that a contractor's attorney, this is Emily Barron. She was a Blue Wave contractor. Her attorney notified Dent and Johnson's attorney that this was illegal. You couldn't pay commissions to an independent contractor salesperson. It violated the anti-kickback statute. There's evidence, and we cite this in our brief, that these concerns were relayed both to Dent and Johnson and Mallory as well. And instead of trying to get an attorney's advice, trying to get to the bottom of it, they abruptly terminated their relationship with Emily Barron. So she's asking questions. She's telling us this is illegal. We're not going to do business with her anymore. That's not good faith attempts to comply with the law. That's trying to brush this under the lug. In addition, we introduced evidence that Dent and Johnson hired an attorney, and that attorney sent them an 11th Circuit opinion that upheld a criminal conviction for paying independent contractor salespeople commissions. The 11th Circuit opinion was important, one, because it was their attorney who said, hey, you should take a look at this, and two, Blue Wave was actually an Alabama company. Johnson was located in Alabama. So this created binding circuit precedent in Blue Wave's home state, and the jury at the least could have concluded that Dent and Johnson were aware of that opinion. So we think there's plenty of evidence on the commission. Under the commission theory, is the kickback that was just the volume-based commission paid to Blue Wave? So, no, there's two different theories. First, there was the fact that Blue Wave was hired as HDL and Singulex's independent contractor, and the contract with Blue Wave paid Blue Wave a volume-based commission. Then also the evidence was that Blue Wave turned around, and the salespeople that it hired were also independent contractors, and they were paid volume-based commissions. So both of those are illegal. Now, granted, Mallory didn't go out and hire the independent contractor salespeople, but Mallory did hire Blue Wave as the independent contractor, and, of course, Mallory could be liable under the conspiracy theory for Blue Wave's additional violation of going out. If HDL hadn't been paying the P&H fees, would the fee structure between Blue Wave and HDL alone be enough to make them liable? So even if P&H fees were never part of the case, the commission structure alone was illegal, and that was what, in fact, HHS had warned about publicly in the Federal Register. That's the clear text of the anti-kickback statute, which creates that exception for employees, but there's no statutory exception for independent contractors. And, frankly, I think this case really illustrates the danger of paying commissions to independent contractors because you had all of these improper practices. Indeed, Denton Johnson—I'm sorry. No, I was just going to ask you. So if the defendants were paying the fair market value with the P&H fees, would there still have been a violation of the AKS? Absolutely, because they were paying volume-based commissions to independent contractor salespeople, and that's just clear. Even if it's a fair market value? Well, so the P&H fees, even if they were fair market value, and I still would like to walk through Judge Wynn, but lots of evidence I have about that. But, yes, the statute, Terry, text is really clear. It says if you pay any remuneration for a prohibited purpose, some of the prohibited purposes are to induce a person to arrange for the provision of federally funded health care services or to recommend the purchasing of federally funded health care purchases, and that's what salespeople do. And, indeed, one contractor even testified that he was paid commissions to literally arrange for doctors to order HDL and Singulex tests. And, of course, as well, these salespeople recommended to doctors that they order HDL and Singulex tests, and they were paid these commissions to do so. Now, as to the P&H evidence, because I know Judge Wynn asked about it, let me just go through some of the evidence, and there's more. First, I'll start with Joint Appendix pages 2155 to 56 and 2160 to 61. These are from the testimony of Dr. You know, you really don't have to read to us this. You just point it to us in the record. I mean, it's almost like an exercise that's interesting, but we've read this and read what's in the record. If you point to us in the record as evidence here, we read it, we got it. Absolutely. So if the court doesn't want the Joint Appendix, I don't have to give them. What I was going to bring up was the testimony, among others, of Dr. Michael Mays. He talked about and he testified that his practice's blood processing costs were substantially less than what the P&H fees were, and he described how his practice would calculate how much they got in fees each month, deduct all their expenses, then distribute the remainder to all the partners as profit. You even had one of the defense witnesses, Dr. Lem, he acknowledged that his practice profited from P&H fees. Then you've got the marketing emails. There was, for example, an email that was sent from one Blue Wave salesperson to a doctor, and he said he sent this at defendant's dense request. It touched a spreadsheet, and it was a comparison, and it showed how if you got P&H fees, it would significantly exceed the cost of hiring a full-time phlebotomist, which is the alternative. There's another email that's really probative here. That's an email, and again, I provide the record set if you want. That's from Mallory to Dent and other Blue Wave salespeople. It talks about how a doctor really wants to use HDL, and he would like HDL to provide a full-time phlebotomist. And Mallory says, well, why don't you show him why he's better off getting P&H fees instead? And I think that's a really probative email because it, one, shows that this wasn't just about, you know, a good faith attempt to get the doctors to have the blood. Here's an email in which the doctor is saying, hey, I'm ready to use you. Just give me a phlebotomist, and we're all set. And Mallory says, no, no, let's show you why you really want the P&H fees. And the jury could easily conclude from that that, one, this was above fair market value, and, two, that the point of these fees was an inducement. It was to get the doctors to order more tests to get more money. There's also evidence from some of the contractors who testified. You, for example, have the testimony of Boomer Cornwell, who was one of these contractors. He talks about how he sent a marketing email advertising the P&H fees as lucrative. And I haven't even gotten into the Medicare evidence. And, of course, there was tons of evidence that Medicare already pays for process and handling services, that these are part of the Medicare bundled payment, and there was testimony that the Medicare bundled payment is fair market value for the entire bundle of services, but then the defendants were paying these people on top of Medicare. That's important as well because there was evidence that not only was Medicare already paying for this, but the defendants were out there, their salespeople were selling this to doctors as, you can take P&H fees on top of Medicare reimbursement. It was also the case that Medicare reimbursement was always more than the P&H fees. So, of course, the doctors were not going to forego Medicare reimbursement in order to get P&H fees, and the defendants acknowledged that. Defendant Dent even testified that he expected the doctors to bill for Medicare visits. I could beat this to death if Your Honor wants more, but we think there was more than enough evidence that the jury could reasonably conclude that these P&H fees exceeded fair market value. How do you explain the fact that you asked for $186 million and you got $16 million? Yeah, so there are a lot of different ways the jury could come up with that. One possibility is that the jury concluded that maybe initially when the defendants started out in this scheme, they had a good faith basis for thinking what they were doing was right, but as the attorney warnings mounted and came in and came in, at a certain point the jury might have concluded, all right, now you've gotten so many attorney warnings that you no longer have the good faith. You're willfully violating the anti-kickback statute, and from that point forward, we're going to find you liable. I don't have the verdict in front of me, so were there any questions that were asked of the jurors? It was a general verdict. The jurors were asked to, as to each defendant, say whether that defendant was liable or not liable. And they quitted Blue Water. Blue Wave, yeah, the LLC, right. So the jury was asked to find, as to each defendant, whether that defendant was liable, and then what were the amount of claims attributable to that defendant, and what was the damages to that defendant. So can I ask you one other question? In its reply brief, the defendants say that the government could not bring this case today. Is that correct? It's absolutely not correct. They're relying on a memorandum from a former associate attorney general. First of all, that memorandum has been superseded by a more recent version. But the more important point is that that memorandum makes clear that one thing you can rely on agency guidance for is C-Enter, and that is, so I don't even understand their objection. But the more important point here is that, you know, the agency guidance is kind of a sideshow in this case. The statutory language is clear. We're relying on the statute. The statute says you can't pay remuneration to someone for a prohibited purpose. It lists those prohibited purposes, and there's no serious dispute that these are those prohibited purposes. So the court really need go no farther than the statute itself. That's the source of liability, and that to the extent there's agency guidance, it just reinforces that they had the guilty mind, that they had the C-Enter. I'd be happy to go over this more. I do want to talk a little bit about the advice of counsel defense, because there's some important parts missing from the defendant's presentation before this court, and that's that among other things, in order for this court to reverse on a jury instruction issue, the defendants have to show that their proposed instruction was correct and that failure to give it was prejudicial, and they fail on that dimension in about three or four different ways. And I would urge the court to go take a look at pages 1663 to 64 of the joint appendix, which is their proposed instructions on advice of counsel. The first thing that jumps out about that is they wanted the district court to charge it as an affirmative defense on which they bore the burden. When the district court refused to do that, that made it easier for them to establish advice of counsel, not harder. So especially in light of the fact that the court did charge on good faith, he did say that the jury should consider the advice that is known to the defendants from attorneys, and they didn't bear the burden, even though they had wanted to bear the burden on this. It's hard to see how there was any prejudicial error here. The next thing that jumps out about their advice of counsel defense is that they wanted to charge it as a complete defense. That's legally wrong, because if you got advice of counsel as to one issue on which you face liability, at best it would give you a defense as to that issue, but it wouldn't give you a defense as to the other issues. So, for example, even if the jury believed that they relied on counsel's advice to the PNHP scheme, it wouldn't be a complete defense to liability. They would still face liability on the commission scheme or on the lack of medical necessity. Another problem is that if you look at their advice of counsel instruction, there's a really important word missing. They wanted the district court to charge that if any defendant faithfully follows the attorney's advice, then the defendant is not liable. That's missing an important qualifier. You have to not just faithfully follow the attorney's advice. You have to follow it in good faith, and if the jury concluded the defendants got an opinion that they liked and then 10 other attorneys told them why that opinion wasn't worth the paper it was written on, the fact that they followed that advice in bad faith would surely not insulate them for liability, and indeed talking, I'm sorry. No, I was just going to ask you, was there discussion about the instructions with the district judge? There was, and I think the district court talked about how we thought that there hadn't been a complete disclosure of all the relevant facts. I'm happy to explain why that was right, but I don't think the court even needs to get there because there are so many problems with the instruction that they proposed, and their request to charge this as an affirmative defense surely was not prejudicial error as to them. So I guess what I'm asking is often in simpler cases than this, to be sure, we have a whole hearing where there are instructions offered by one side and then instructions offered by the other, and the judge chooses between them, and people give their objections. Was there that kind of thing? There was a charge conference, Your Honor. I think where maybe the confusion is coming from is that the parties gave written proposed instructions, and they were numbered, and then this was discussed over an extensive charge conference, and at the end of the charge conference, you can see that from the transcript that the district court was clearly looking at the written instructions, and they were written proposed instructions, and they were numbered instructions, and the judge goes down as to each one he's not giving. He explains, all right, as to number 20, here's why I'm not doing it. Number 21, here's my problem. Number 22, et cetera. So I think that discussion in the transcript makes a little bit more sense if you also have the proposed written instructions in front of you. And they are in the record, right? Absolutely, and the joint appendix 1663 and 64 are the defendant's proposed instructions on advice of counsel. And I want to add one other point on that, which is that their complete defense language was also legally erroneous because as this court recognized in the Drakeford opinion, even if you get a counsel's advice, and maybe it might be reasonable to rely on it for a period of time, if a later attorney later tells you all the reasons why that previous attorney's advice can't be relied upon anymore, if you continue to rely on that first attorney's advice who told you what you want to hear, you might no longer be legitimately relying on the advice of counsel, and the defendant's proposed instruction, again, would have just given you this complete defense language. So as soon as they got one opinion, then they could have closed their ears off to everybody else who told them that what they were doing was wrong. Let me ask you, was it the government's duty to show that the defendants didn't fully disclose everything to their attorneys? So I think in order to whether or not they get the instruction, the district court thought that there hadn't been a complete disclosure at the relevant time, and I think it's important to understand this court's case law does talk about how you have to get the attorney's advice before you engage in the illegal activity. The only thing that they have pointed to in their brief that predates the whole scheme was this 2009 email that Mallory sent and gets forwarded to Attorney Patrick Hurd. Patrick Hurd's email, which the court can see, it's in the record, it's a qualified opinion. He says, here's my initial take. I want to think about it some more. I want to go read some stuff. And then there's no evidence in the record that goes beyond that that shows that he actually blessed this. And, in fact, Patrick Hurd is interesting for another reason, because he shows up again later in an exhibit. You can find this fascinating email chain at Joint Appendix 5058, which is when Mallory drafts her position statement on P&H. Her position statement concludes by saying, this doesn't violate the Anti-Kickback Statute and the False Claims Act. Hurd responds, and he says, I've made some corrections. He deletes that statement where she said it doesn't violate the Anti-Kickback Statute and the False Claims Act. He deletes it, and you can see that in the red line. And instead he says, well, it complies with some of the requirements of the safe harbor, and that's all that he was willing to say. So I think it's particularly hard for them to say that Patrick Hurd somehow blessed this and that they relied on counsel's advice from the very beginning. I'd be happy to address any other questions. I know there's a lot of issues in the case, but otherwise we would ask this court to affirm. Thank you very much. We appreciate your argument. Mr. Wilkins? Mr. Wilkins? Since the court prepared to adjourn a recent case in Rome versus Burma Capital, and there the Mets, the then law firm, was sued for malpractice because it didn't tell their client it was claimed that they were being illegal. The court said no just because the charges told you that it was just a glimpse. They had to tell you. Mr. Wilkins, we can hardly hear you. At least I can. Maybe you're not hearing the microphone. In any event, anyway, the court granted some of the judgment in favor of the law firm because they said the law is unclear as to whether the payment of P&H was legal or not until a special follow-up was issued by the Department of Justice. Now, the contract we're talking about, the P&H contract, was drawn up by the lawyer before they even started doing business. That is how we're going to pay $3, $17. That was fully disclosed to the lawyers. It was drawn up by the lawyers, and it was never modified. It was strictly adhered to by the appellate during the entire time that they were in business. In July, the special follow-up alert was issued, but six months before that, the Department of Justice, all the way back and forth with these lawyers all this time, interacts with the Department of Justice making sure everything is done right. He said in writing, I know I have not informed you of the government's position whether or not the issue of P&H being prosecuted can be kicked back into violation. And then, of course, comes the special follow-up alert, and the government says, well, this was issued because it's just like many of the others we issued. When the area is vague, and I'm quoting, when the area is vague and not spoken that needs to be clarified, we will issue the special follow-up alert. And it was not until that time that there was really any definitive statement by anybody that what you're doing is illegal. Now, Your Honor, you mentioned the Klugman memo. One, that was never given to Johnson and Dent. And number two, contrary to what the government says,  and I quote from what he said in his memorandum that he wrote, he says there's a high risk that OIG would argue that the P&H does not meet all the requirements of an AKA self-harbor. Now, that's a far cry from saying something isn't legal. Certainly, there's a risk in about every major business decision anybody makes. The question is whether or not you cross the line and whether or not it becomes illegal. Now, let me mention the advice of counsel just a minute. That is an affirmative defense contrary to what the government says, and we were entitled to an affirmative defense charge to the jury. Here's what the DeVries case, D.C. elite case in this area on this issue. Even though the government produced a laundry list of supposedly facts allegedly not disclosed, the district court was required to give the reliance of advice of counsel charge if there's any foundation in the evidence sufficient to bring this issue into the case, even if the evidence is weak, even if it's inconsistent, even if there's some doubtful credibility. Well, in our case, the evidence of reliance advice on counsel was not weak. The contract was brought up with the lawyers doing the drafting, but it's a PNHP contract, and it was not inconsistent, and it was not of doubtful credibility, but even if it had been, even if it had been, we were entitled to a jury charge on advice of counsel. Let me mention, take a look at this. Martel was a nonpartisan. He was called by the government. A unit man of his competition was going to take the case. They were allowed to ask him 62 questions. Out of the blue, the judge halfway through the questions being asked, he said, I believe there's an advocate in there, but he's a co-conspirator. Therefore, I'm going to charge the jury an adverse interest. And let me just kind of give you an idea of what this meant for us. The harm to the appellants here. Here's what happened. During the question, question 61, the government proposed the appeal. Shows them a piece of paper that's an email. The question is, is this email from Bacranciani was sent to Scott Tramboni? He says, Martel says, I take the fifth. The government then turns to the jury and publishes this email. You see here, Mr. Tramboni writes, please tell me how this is not a kickback. And then the lawyer turns to the judge and says, we offered this to evidence, Your Honor. Well, of course, the judge sustained the objection, but it's too late. The damage had been done. It was published to the jury. Immediately thereafter, Martel is excused. The judge turns to the jury, and he says, you can draw an advocate from the fact that he's taken the fifth. So highly prejudicial. And even if that was not the case, he's asking 62 questions. 62, I take the fifth. It's highly prejudicial, as other courts have so appealed. Mr. Wilkin, I think your time has expired, unless my colleagues have some further questions. I said I've got another minute, Your Honor. No, I think that means you're over a minute. Thank you very much.
judges: Diana Gribbon Motz, James A. Wynn Jr., Henry F. Floyd